**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
Houston Division**

| | | |
|---|---|---|
| JOSHUA JUMBO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 4:15-cv-01451 |
| | ) | |
| DOLGENCORP OF TEXAS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT DOLGENCORP OF TEXAS, INC.'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Respectfully submitted,

Joel S. Allen
Texas Bar No. 00795069
jallen@mcguirewoods.com
Melissa M. Hensley
Attorney-in-Charge
Texas Bar No. 00792578
S.D.T.X. Bar No. 24949
mhensley@mcguirewoods.com

McGuireWoods LLP
2000 McKinney Avenue, Suite 1400
Dallas, Texas 75201
Telephone: 214.932.6400
Facsimile: 214.932.6499

ATTORNEYS FOR DEFENDANTS

85403069_2

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ......................................................................................... 1

II.  STATEMENT OF FACTS ........................................................................... 2

    A.  Plaintiff's Employment ..................................................................... 2

    B.  In 2013, Jumbo Voiced Complaints Against His District Manager on Four Occasions, Only Three of Which May Be Construed as Protected Activity ......... 4

    C.  Plaintiff's Termination for Falsification of Progress Reports............................ 7

    D.  Jumbo Is a Habitual Litigant............................................................... 9

III.  ARGUMENTS AND AUTHORITIES........................................................... 10

    A.  Summary Judgment Standard ......................................................... 10

    B.  Elements of a National Origin Discrimination Claim............................ 11

    C.  Elements of a Retaliation Claim ..................................................... 12

    D.  Summary of Jumbo's Allegations of National Origin Discrimination and Retaliation ........................................................................................ 13

    E.  Jumbo's Inability to Establish a Prima Facie Case for National Origin Discrimination or Retaliation................................................................ 13

    F.  Allegation No. 1 - No Prima Facie Case for Failure to Hire Directly Into a Store Manager Position; and Defendant's Legitimate, Non-discriminatory Reasons ........................................................................................... 15

    G.  Allegation No. 2 - No Prima Facie Case for Any Failure of District Manager to Train Jumbo on RMS System; and Defendant's Legitimate, Non-Discriminatory Reasons................................................................... 17

    H.  Allegation No. 3 - No Prima Facie Case for the Claim that Jumbo Was Discriminated Against Because He Allegedly Was Not Provided an Assistant Store Manager ................................................................... 19

    I.  Allegation No. 4 - No Prima Facie Case for Alleging that Jumbo's District Manager Threatened to (But Did Not) Transfer Him ............................... 22

    J.  Allegation No. 5 - No Prima Facie Case for Alleged "Abusive" Language Towards Plaintiff ............................................................................. 22

    K.  Allegation No. 6 - No Prima Facie Case For the Allegation that Jumbo Was Discriminatorily Denied Additional Security Measures to Deter Theft; and Defendant's Legitimate Non-Discriminatory Reasons ..................... 24

    L.  Allegation No. 7 – Jumbo's Allegations that He Was Not Evaluated Nor Given a Raise Are False; No Prima Facie Case; and Defendant's Legitimate, Non-Discriminatory and Non-Retaliatory Reasons.......................... 26

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

M.     Allegation No. 8 - Allegation that Jumbo Was Subject to Excessive Monitoring by His District Manager is False; No Prima Facie Case .................. 28

N.     Allegation No. 9 – Allegation that Jumbo's Payroll Budget Was Cut is False; No Prima Facie Case ...................................................................... 29

O.     Allegation No. 10 – No Prima Facie Case for Allegation that Jumbo Was Terminated Because He Was Nigerian and/or in Retaliation for Prior Complaints of Discrimination; and Defendant's Legitimate, Non-Discriminatory and Non-Retaliatory Reasons ........................................ 30

P.     Allegation No. 11 - Allegation that Jumbo's Store Visit Ratings "Tanked" in Retaliation for His Complaints of Discrimination are False; No Prima Facie Case ........................................................................................ 32

Q.     Allegation No. 12 – No Prima Facie Case for Alleged Write-Ups and Threats of Termination in Retaliation for His Complaints of National Origin Discrimination ........................................................................ 34

IV.    CONCLUSION ...................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................................10, 11

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................................................10, 11

*Crisp v. Sears Roebuck & Co.*,
628 F. App'x 220 (5th 2015) ...................................................................................12

*Gonzalez v. Champion Techs., Inc.*,
384 S.W.3d 462 (Tex. App.—Houston 2012, no pet.) .........................................12

*Jumbo v. Landmark Indus.*,
4:10-cv-02238, DKT 46 (S.D. Tex. Nov. 21, 2011) (*Landmark awarded
summary judgment and costs in its favor*) ...............................................................10

*Jumbo v. Mobil Oil Corp., 4:89-cv-03946, DKT 75 (S.D. Tex. Nov. 4, 1991),
affirmed DKT 86 (verdict in Mobil Oil's favor, affirmed on appeal)* ......................10

*Jumbo v. Rodrigues*,
4:12-cv-02906, DKT 33 ............................................................................................10

*Jumbo v. Valero Holdings, Inc.*,
4:09-cv-02246 (S.D. Tex. 2009) ...............................................................................10

*Lucan v. HSS Sys., L.L.C.*,
439 S.W. 3d 606 (Tex. App.—Eastland 2014, no pet.) .........................................13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ...................................................................................................10

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) ...................................................................................................12

*Michael v. City of Dallas*,
314 S.W.3d 687 (Tex. App.—Dallas 2010, no pet.) ...............................................11

*Okoye v. Univ. of Tex. Houston Health Science Ctr.*,
245 F.3d 507 (5th Cir. 2001) ....................................................................................11

*Pickens v. Shell Tech. Ventures Inc.*,
118 F. App'x 842, 2004 WL 2980291 (5th Cir. 2004) .........................................12

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Price v. Marathon Cheese Corp.*,
   119 F.3d 330 (5th Cir. 1997) ................................................................................12

*Univ. of Tex. at El Paso v. Esparza*,
   --- S.W.3d ---, 2016 WL 5404795 (Tex. App.—El Paso Sept. 28, 2016) ........................13, 31

*Univ. of Tex. Sw. Med. Ctr. V. Nassar*,
   133 S.Ct. 2517 (2013) ................................................................................13

**Other Authorities**

Fed. R. Civ. P. 56 ................................................................................1

Fed. R. Civ. P. 56(c) ................................................................................10

**DEFENDANT DOLGENCORP OF TEXAS, INC.'S**
**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Dolgencorp of Texas, Inc. ("Dollar General" or "Defendant") submits this Motion for Summary Judgment as to all counts contained in the Complaint filed by Plaintiff Joshua Jumbo ("Jumbo" or "Plaintiff") as follows:

## I.    INTRODUCTION

Plaintiff Joshua Jumbo, of Nigerian national origin, was recruited and hired by Dollar General in May of 2012 through a fellow-Nigerian District Manager, Nelson Ejiogu ("Ejiogu"). Jumbo was placed into a Store Manager Candidate position with the promise of a forthcoming promotion to a Store Manager position after he was successfully trained to operate a Dollar General store, something that he admittedly did not know how to do upon hire.  After attending Store Manager training, Jumbo was then evaluated by his Nigerian District Manager, rated favorably, and then promoted to a Store Manager position (and given his own store to manage). Less than five months into his tenure as a Store Manager, and as part of Dollar General's established annual performance evaluation procedure, Ejiogu further evaluated Jumbo's performance and gave him a favorable rating.  Based upon this favorable rating, Jumbo received a raise, effective on April 6, 2013.

Thereafter, in January of 2014 while acting as Store Manager, Jumbo falsified Dollar General progress reports, reflecting he had done certain of his assigned tasks when in fact, he had not.  In addition to falsifying the reports, Jumbo made additional blatant misrepresentations to his District Manager regarding the uncompleted job assignments.   Upon discovering these misrepresentations, and as a direct result of this dishonesty, Jumbo was promptly terminated the

day following these misrepresentations.  Plaintiff now alleges that his termination - by the same

Nigerian District Manager who recruited hired, favorably evaluated, promoted, and rated him in

a manner that resulted in pay increases, *and shares his same national origin* - was a result of

either national origin discrimination or in retaliation for prior alleged complaints of national

origin discrimination.   In total, Jumbo makes a dozen complaints of national origin

discrimination and retaliation as summarized in the attached Exhibit A, and as fully outlined

herein.  As shown below, Dollar General is entitled to summary judgment as to each of these

claims.

## II.     STATEMENT OF FACTS

### A.     Plaintiff's Employment

Jumbo interviewed in person with District Manager Ejiogu (Ex. B, Depo. 64:2-21),[1] a

fellow Nigerian (Ex. B, Depo. 65:24-25).   Jumbo was hired on May 4, 2012 into a Store

Manager Candidate position, and understood that once he was trained to run a Dollar General

store, he would be promoted to a Store Manager position.  (Ex. B, Depo. p. 66:16-67:4; 70:3-5;

81:13-14).  Jumbo accepted this job position, and was trained to become a Store Manager.  (Ex.

B, Depo. 68:1-11; 82:5-21 (trained in other stores by training Store Managers); 122:10-123:13

(Jumbo also attended a two-week classroom training)).   Jumbo admits that he did not know how

to run a Dollar General store before his training as a Store Manager Candidate.  (Ex. B, Depo.

86:15-87:15).  In September of 2012, as a Store Manager Candidate, Jumbo was evaluated by

Ejiogu and rated favorably.  (Ex. B, Depo. 120:24-121:24; Ex. B, Depo. Exh. 16 ("New Store

Manager Evaluation," dated September 19, 2012, rating Jumbo as Satisfactory in all categories,

---

[1] Jumbo's Deposition, taken October 27, 2016, was the only deposition taken in this case.  Thus, it will be cited to herein as "Depo.", followed by page and line numbers.  Excerpts from Jumbo's Depo., including deposition exhibits, are attached hereto as Exhibit B.

and non-satisfactory in no categories).  Following his training and this favorable evaluation, on October 13, 2012, Jumbo was promoted to a Store Manager position by Ejiogu, and given his own store to manage.  (Ex. B, Depo. 96:1-4; 120:24-122:9; 122:15-123:13 (Jumbo was a Store Manager starting in October 2012); Exhibit C, Declaration of Ty Jones "Jones Decl." ¶2 (October 13, 2012 was Jumbo's promotion date to Store Manager)).

Dollar General conducts annual performance reviews of its Store Managers, based upon their performance in the prior fiscal year, which runs from February of any one year through January of the following year.  (Ex. C, Jones Decl. ¶11).  Thus, as Jumbo was employed as a Store Manager in fiscal year 2012 (which ended in January of 2013), he was evaluated for 2012 on March 6, 2013 by his District Manager, Nelson Ejiogu (Ex. C, Jones Decl. ¶13), less than five months after being promoted to his Store Manager position (October 13, 2012 – March 6, 2013).  Ejiogu evaluated Jumbo's performance and rated him "Very Good" in ten categories, "Good" in four categories, and "Needs Improvement" in only two categories, an overall "Good" rating, which is a favorable rating.  (Ex. C, Jones Decl. ¶14; *see also* Ex. B, Depo. Exh. 13, "2012 Performance Review").  Jumbo does not recall receiving this performance review from his District Manager.  (Ex. B, Depo. 103:20).  Despite Jumbo not recalling doing so, Dollar General's records indicate that Jumbo, in fact, received the evaluation, acknowledged it, and applied his electronic signature to the performance evaluation on March 11, 2013, at 7:43 a.m.[2] (Exhibit D, Declaration of Kimberly Huffman "Huffman Decl." ¶2).  In any event, immediately thereafter in April of 2013, Jumbo's salary was increased by 2.7% - from $41,938 to $43,070, annually, and this pay increase was awarded as a direct result of his favorable performance

---

[2] Jumbo's access to this performance review was protected by a personal password that he was charged to keep confidential and not share with others.  (Ex. D, Huffman Decl. ¶4).

review.  (Ex. C, Jones Decl. ¶3).  Further, Jumbo admits that merit increases at Dollar General are a result of receiving a favorable performance review.  (Ex. B, Depo. 104:23-105:10).  Jumbo earned this higher salary from April 2013 through the end of his employment in January 2014. (Ex. C, Jones Decl. ¶3).

**B.**      **In 2013, Jumbo Voiced Complaints Against His District Manager on Four Occasions, Only Three of Which May Be Construed as Protected Activity**

First, Jumbo alleges that, prior to May 20, 2013 (and thus, approximately eight or more months before his termination), he complained to his Regional Director that his District Manager, Ejiogu, was "beginning to show some hostility … [and was] being disrespectful" towards him, and that he did "not appreciate it."  (Ex. B, Depo. 203:12-204:4).  Jumbo admits no other words were used to complain of his District Manager than these limited words.  (Ex. B, Depo. 203:12-204:4).  Thus, this does not amount to a protected activity.  In fact, Jumbo admits that the first time he complained that someone was treating him differently because of his national origin was on May 20, 2013.  (Ex B, Depo. 166:7-21; 168:13-18).

Second, on May 20, 2013, Jumbo called the Human Resources department, and further documented this call with a summary e-mail, to complain of four things against his District Manager: 1) that Ejiogu was interfering with the staffing of his store by: failing to provide him with an effective Assistant Store Manager ("ASM"), refusing to allow him to post a "Now Hiring" sign, and refusing to show him how to access the RMS (application review) system; 2) that Ejiogu threatened to transfer him to another district because Jumbo and the District Manager were "both Nigerian"; 3) that Ejiogu used the word "nonsense" towards him; and 4) that Ejiogu told Jumbo that he did not think Jumbo was "the most honest person in the world."  (Ex. B, Depo. 157:2-158:3; Ex. B, Depo. Exh. 18 (Jumbo's contemporaneous email summarizing his

complaints).    In  closing,  Jumbo  asked  that  Ejiogu  be  required  to  treat  him  with "professionalism."  *Id.*  Following these communications, Jumbo alleges the Human Resources Representative (Ty Jones), his District Manager (Nelson Ejiogu), and a loss prevention specialist (Gus Castano) visited his store.  (Ex. B, Depo. 213:10-13; 214:15-19).  Although Jumbo alleges he was "talked down to", threatened with termination, and written up[3] in retaliation for his complaint (Ex. B, Depo. 213:18-24), he admits that nothing adverse happened to him following this meeting in response to his May 20, 2013 complaints.  (Ex. B, Depo. 220:1-11 (when asked what happened after this meeting, Jumbo replied, "Nothing."); 221:17-223:10 (admits no adverse action following his May 20, 2013 complaints and before his June 2013 complaints).

Third, on June 13, 2013, Jumbo called Human Resources to voice additional complaints against his District Manager, and he documented this call in an e-mail to Human Resources the following day on June 14, 2013.  (Ex. B, Depo. 223:11-18; Ex. B, Depo. Exh. 20 (Jumbo's contemporaneous email summarizing his complaints)).    In  this  communication,  Jumbo acknowledged that his ASM had voiced complaints against Jumbo, which led to a meeting between the ASM, Jumbo, and his District Manager, Ejiogu.  (Ex. B, Depo. Exh. 20).  Jumbo further reported that: 1) Ejiogu threatened to terminate his employment because of his store's performance; 2) Ejiogu told Jumbo that he was "cocky"; and 3) Ejiogu treated him "differently from similarly situated Store Managers" because of his national origin.  (Ex. B, Depo. Exh. 20).

Fourth, on June 21, 2013, Jumbo called the Employee Response Center at Dollar General to complain of "retaliation" by his District Manager and the Human Resources Representative,

---

[3] Jumbo cannot recall a single thing he was allegedly written up for, and testified that the "record would speak for itself" and that he was globally referring to "all my write-ups."  (Ex. B, Depo. 215:2-216:4).  There are no write-ups in Jumbo's personnel file, no performance improvement plans, and no negative performance evaluations, and Dollar General is aware of no such documents ever existing.  (Ex. C, Jones Decl. ¶4).

alleging that: 1) he was not being allowed to hire an ASM; and 2) he was not allowed to post a "now hiring" sign at his store.  (Ex. B, Depo. 240:3-241:23; Ex. B, Depo. Exh. 21).   Jumbo admits that these two June 21, 2013 complaints are duplicative of those voiced in Jumbo's May 20, 2013 e-mail to Human Resources.  (Ex. B, Depo. 240:21-243:17; 244:12-245:11; *also compare* Ex. B, Depo. Exh. 18 (on May 20, 2013, allegedly not being provided an ASM and not being allowed to post a "now hiring" sign), and Ex. B, Depo. Exh. 21 (on June 21, 2013, allegedly not being allowed to hire an ASM and not being allowed to post a "now hiring" sign). These June 21, 2013 complaints of retaliation merely mirror Jumbo's original May 20, 2013 complaints, and thus do not assert any new complaint that could be characterized as done in retaliation for the previous complaints.

Each of these four complaints by Jumbo (three of which may arguably be called "protected activity") took place in the first half of 2013: prior to May 20; June 13-14; and June 21, 2013.  Thereafter, for the remainder of 2013, Jumbo was not terminated, demoted, stripped of his job title, transferred to another location, nor given a decrease in his salary.  (Ex. B, Depo. 247:16-249:2).  Further, although he alleges his incentive bonus may have been less that it would have otherwise been due to a burglary,[4] he admits his ability to earn incentive bonuses in 2013 was also not impacted.  (Ex. B, Depo. 249:3-17; 260:20-261:11).   In fact, the fiscal quarter in which he made each of his complaints (May – July 2013) was the quarter in which he earned the *highest* quarterly incentive bonus of his entire tenure as a Store Manager. (Ex. B, Depo. 257:23-

---

[4] Jumbo alleges that the burglary occurred due to his being discriminatorily denied security gates for his store, and thus, any theoretical loss from this burglary that may have impacted his incentive bonus was, in turn, discrimination.  These are large leaps conceptually, but they can be fully disregarded as the evidence establishes that Jumbo's incentive bonuses for 2013 would have been exactly the same even if all the burglaries in his store had never happened in 2013. *See* III.K., *infra*.

258:7; *see also*, Ex. B, Depo. Exh. 14, p. 17 (Jumbo's pay records, showing his largest incentive bonus of $950 paid following the close of the second fiscal quarter ending in July 2014). Jumbo suffered no adverse employment action in all of 2013 following his complaints made in the first half of the year.

### C.    Plaintiff's Termination for Falsification of Progress Reports

On Wednesday, January 8, 2014, almost eight months after his first complaint of national origin discrimination and seven months after his last complaint of retaliation, but only one day after his falsification of company reports and his dishonesty with his District Manager, Jumbo was terminated for falsifying company progress records.

On Tuesday, January 7, 2014, Jumbo had a deadline of noon (Ex. B, Depo. 261:24-262:3) to complete a set of weekly assigned tasks (called "Super Tuesday" tasks), including price changes that were to be timely posted in his store. Each store would receive a physical package each week, called a "fulfillment kit", (that would have new pricing signs to be posted (to reflect price changes) and plan-o-grams (merchandising schematics) to be processed in the stores each week. (Ex. B, Depo. 299:17-300:3). On Monday, January 6, 2014, Jumbo worked late in his store, into the early morning hours of Tuesday, January 7, 2014, allegedly to complete his Super Tuesday tasks. (Ex. B, Depo. 261:17-262:17). Close to 3:00 a.m., on Tuesday, January 7, 2014, Jumbo accessed a progress reporting system (called START), and marked a whole host of assigned job tasks as "Completed." (Ex. B, Depo. 262:13-263:22; Ex. B, Depo. Exh. 25). He then went home for the night. (Ex. B, Depo. 262:13-17). Less than 5 hours later, at 7:52 a.m. on Tuesday, January 7, 2014, Jumbo sent an e-mail to his District Manager, Ejiogu, asserting that all of his assigned Super Tuesday tasks were completed, including price changes (that were included as part of his fulfillment kit). His email stated, in particular, "Dear Nelson, This email serves to

validate the completion of my Super Tuesday tasks including price changes.  I will be in traffic court this morning.  Thanks, Josh [Jumbo]".  (*See* Ex. B, Depo. 262:13-263:22; Ex. B, Depo. Exh. 22).

At the time of marking his START tasks as complete, and sending this early morning e-mail to his District Manager asserting the same, Jumbo did not know that his District Manager would be visiting his store that day.  (Ex. B, Depo. 263:2-264:4).  In fact, Ejiogu visited Jumbo's store with Ms. Jones.  (Ex. C, Jones Decl. ¶20; Exhibit E, Declaration of Nelson Ejiogu "Ejiogu Decl." ¶2).  Ejiogu and Jones observed that the Super Tuesday tasks that were marked as completed, were in fact, not completed; that the fulfillment kit had not been worked; and that price changes in Jumbo's store were not posted as Jumbo represented they were.  (Ex. C, Jones Decl. ¶20; Ex. E, Ejiogu Decl. ¶¶2-4).  Jones documented that the work had, in fact, not been completed.  She photographed the fulfillment kit that remained still packed in the delivery box and that had not been worked (Ex. C, Jones Decl. ¶20; Ex. C, Jones Decl. Ex. 4(a));  photographed price changes that had not been posted in Jumbo's store (Ex. C, Jones Decl. ¶20; Ex. C, Jones Decl. Ex. 4(b)); photographed store flyers that were still in the fulfillment box in Jumbo's store (Ex. C, Jones Decl. ¶20; Ex C, Jones Decl. Ex. 4(c)); and photographed price breaks that were not posted in Jumbo's store  (Ex. C, Jones Decl. ¶20; Ex. C, Jones Decl. Ex. 4(d).  Ejiogu added annotations to these photographs explaining how they demonstrated that certain START tasks were not completed as Jumbo had represented.  (Ex. E, Ejiogu Decl. ¶5).

Thereafter, Ejiogu and Jones met with Jumbo.  (Ex. E, Ejiogu Decl. ¶6).  Jones asked Jumbo if he had sent the January 7, 2014, 7:52 a.m. email to Ejiogu, in which he alleged he had completed the Super Tuesday tasks, to which Jumbo admitted he had.  (Ex. B, Depo. 289:2-290:11; Ex. E, Ejiogu Decl. ¶6).  During this meeting, Jumbo also admitted the tasks marked as

completed were not actually completed. (Ex. E, Ejiogu Decl. ¶6; *see also* Ex. B, Depo. Exh. 31, Personnel Action Form, noting Jumbo's admission, during the January 8, 2014 follow-up visit, that the tasks marked completed were not actually done).   During the investigation, and during his deposition, Jumbo tried to explain that he could not have completed his Super Tuesday tasks, because he alleged that he did not get his fulfillment kit that week.  (Ex. E, Ejiogu Decl. ¶6; Ex. B, Depo. 299:17-303:11; Ex. B, Depo. Exh. 26 (contemporaneous handwritten note during investigation stating, "I did not receive price break signs.")).  Taking Jumbo's allegation as true – that there was a good reason for not completing his tasks – namely, that he did not receive the tools from Dollar General to complete the tasks – does not change the fact that his report in the START system, and his subsequent email to his District Manager (asserting the tasks were completed) were false.   The tasks were not completed, and thus, affirming that they were completed in the progress reports was a falsification of company records, which is the grounds for which Jumbo was fired on January 8, 2014.  (Ex. E, Ejiogu Decl. ¶6; Ex. B, Depo. 313:7-24 (Jumbo was told he was being terminated for falsifying company records in marking tasks completed in the START system when they had not been completed); Ex. B, Depo Exh. 31 (Personnel Action Form, noting reason for Jumbo's termination was falsification of company documents)).

>        **D.**        **Jumbo Is a Habitual Litigant**

With the exception of two employers that he can recall from the 1980's, Jumbo claims to believe that all of his employers over his entire adult life have discriminated against him because of his race and/or national origin.  (Ex. B, Depo. 12:11-14:4).  As such, Jumbo is no stranger to lodging discrimination complaints against employers (and others).  This current lawsuit is at least his seventh such lawsuit alleging discrimination.  (Ex. B, Depo. 6:14-12:10; 20:50-21:7; 24:21-

25:9).[5]  Despite decades of litigating, however, no fact finder has ever found that Jumbo was, indeed, a victim of discrimination, and Jumbo has repeatedly had his cases thrown out.  *See e.g., Jumbo v. Mobil Oil Corp.*, 4:89-cv-03946, DKT 75 (S.D. Tex. Nov. 4, 1991), *affirmed* DKT 86 (verdict in Mobil Oil's favor, affirmed on appeal); *Jumbo v. Valero Holdings, Inc.*, 4:09-cv-02246 (S.D. Tex. 2009) (referred to arbitration (*see* DKT 8) and arbitrator found in favor of Valero (*see* DKT 13-2 at 13-14); *Jumbo v. Landmark Indus.*, 4:10-cv-02238, DKT 46  (S.D. Tex. Nov. 21, 2011) (Landmark awarded summary judgment and costs in its favor); *Jumbo v. Rodrigues*, 4:12-cv-02906, DKT 33 (summary judgment in favor of Wal-Mart and individual defendants); *see also*, Ex. B, Depo. 26:20-27:5; 27:19-23 (Jumbo admits case resolved in Mobil Oil's favor, and this judgment was affirmed by the Fifth Circuit Court of Appeals after Jumbo's appeal); 29:4-7 (Jumbo admits he lost his case against Valero); 29:21-25 (Jumbo admits Wal-Mart was awarded summary judgment in his lawsuit against it); 30:1-4 (Jumbo affirming that no judge or jury has *ever* found that he was discriminated against on the basis of his race or national origin).

## III.   ARGUMENTS AND AUTHORITIES

### A.   <u>Summary Judgment Standard</u>

Summary judgment is an important procedural tool used to weed out untenable causes of action and to preserve for trial only genuine issues of material fact.  *See* Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). Rule 56(c) "mandates the entry of summary judgment after adequate time for discovery and upon motion,

---

[5] Jumbo has been involved in other litigation with other parties as well, including bankruptcy proceedings, litigation against his ex-wife, and a claim of legal malpractice against at least one of his prior attorneys.  (Ex. B, Depo. 21:8-22:4; 25:10-26:11).

against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

A defendant is not required to put forth evidence that negates a plaintiff's claim or shows the absence of a genuine issue of material fact; defendant must merely point out that there is an absence of evidence supporting a plaintiff's case. *See id.* at 323, 325. "The mere existence of some alleged material factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material facts." *Anderson*, 477 U.S. 242, 247-48. A "material" fact is one that is dispositive, has legal significance, and affects the outcome of the suit under the governing law. *Id.* at 248. Thus, even when there are factual issues, they do not preclude summary judgment unless the disputed facts are material to the case. *Id.*

### B.      Elements of a National Origin Discrimination Claim

Plaintiff has asserted claims of nation origin discrimination under federal and Texas law. The elements of a prima facie case of national origin discrimination are identical under federal and Texas law. *See, e.g.*, *Michael v. City of Dallas*, 314 S.W.3d 687, 690-91 (Tex. App.—Dallas 2010, no pet.). To establish a prima facie case of national origin discrimination, a plaintiff must demonstrate that he: (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was replaced by someone not of the protected class *or* other similarly situated employees were treated more favorably. *See Okoye v. Univ. of Tex. Houston Health Science Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001); *Michael*, 314 S.W.3d at 690-91. A plaintiff may establish national origin discrimination using workplace remarks as direct evidence. To do so, a plaintiff must show that the remarks: (1) related to plaintiff's

national origin; (2) were proximate in time to the adverse employment decision; (3) were made by an individual with authority over that decision; and (4) relate to the adverse employment decision. *See Crisp v. Sears Roebuck & Co.*, 628 F. App'x 220, 222 (5th 2015).

Under the *McDonnell Douglas* (*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)) framework, which applies in national origin discrimination cases, if the plaintiff establishes a prima facie case based on circumstantial evidence, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the adverse employment action. If the defendant successfully offers such a reason, the burden shifts back to the plaintiff to demonstrate that the defendant's reason was a pretext for discrimination. *See Pickens v. Shell Tech. Ventures Inc.*, 118 F. App'x 842, 2004 WL 2980291, at *2 (5th Cir. 2004). A plaintiff cannot establish pretext "by mere subjective beliefs that discrimination motivated an employer's actions." Rather, a "plaintiff must prove that [the protected characteristic] *'actually played a role in' and 'had a determinative influence on' the employer's decision-making process*." *Price v. Marathon Cheese Corp.*, 119 F.3d 330, 337 (5th Cir. 1997) (emphasis added).

### C.     Elements of a Retaliation Claim

Plaintiff has asserted claims of retaliation under both federal and state law. The elements of a prima facie case of retaliation are identical under federal and Texas law. *See Gonzalez v. Champion Techs., Inc.*, 384 S.W.3d 462, 466 (Tex. App.—Houston 2012, no pet.). To establish a prima facie case of retaliation, a plaintiff must demonstrate that: (1) the plaintiff engaged in a protected activity; (2) an adverse employment action occurred; and (3) a causal link existed between the protected activity and the adverse action. As with a claim for national origin discrimination, once a plaintiff has established a prima facie case of retaliation based on circumstantial evidence, the court will apply the *McDonnell Douglas* framework. *See id.* at 489;

*Lucan v. HSS Sys., L.L.C.*, 439 S.W. 3d 606, 611 (Tex. App.—Eastland 2014, no pet.).

To show the necessary causal link between a plaintiff's protected activity and the adverse action, a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. V. Nassar*, 133 S.Ct. 2517, 2534 (2013); *see also Univ. of Tex. at El Paso v. Esparza*, --- S.W.3d ---, 2016 WL 5404795, at *6 (Tex. App.—El Paso Sept. 28, 2016) (requiring a "plaintiff to establish a 'but for' causal nexus between the protected activity and the employer's prohibited conduct"). The temporal proximity between the protected activity and the adverse employment action may "raise an inference of retaliation, but the events must be very close in time." *Esparza*, 2016 WL 5404795, at *7.

### D.      Summary of Jumbo's Allegations of National Origin Discrimination and Retaliation

Jumbo states twelve claims for national origin discrimination and/or retaliation. For six of Jumbo's claims (*See* Exhibit A, attached hereto, Summary of Jumbo's Claims for National Origin Discrimination and Retaliation, Allegation Nos. 1-6), he can only state a national origin discrimination claim because these incidents each occurred *prior to* any complaints of national origin discrimination by Jumbo, and thus, before any alleged protected activity that could support a retaliation claim. (*Id.*). For four of Jumbo's claims, Jumbo asserts both a national origin discrimination claim and a retaliation claim. (*See* Ex. A, Allegation Nos. 7-10). The remaining two claims are solely retaliation claims. (*See* Ex. A, Allegation Nos. 11-12).

### E.      Jumbo's Inability to Establish a Prima Facie Case for National Origin Discrimination or Retaliation.

Dollar General concedes Jumbo is a member of a protected class based upon his Nigerian national origin. With the exception to his first claims for a failure to hire him directly into a

Store Manager position (instead of hiring him as a Store Manager Candidate), for the purposes of this Motion, Dollar General concedes Jumbo was qualified for his position.  However, Jumbo admittedly was not qualified to hold a Store Manager position until he was properly trained by way of the Store Manager Candidate position.  (*See* Ex. A, Allegation No. 1; III.F., *infra.*).

Plaintiff alleges a handful of ways that he believes he was treated less favorably by his District Manager than similarly situated Store Managers who are not Nigerian.  However, there are only three allegations that could *possibly* be construed as resulting in an adverse employment action: (1) his allegation of being hired into the Store Manager Candidate position instead of being hired directly into a Store Manager position (Ex. A, Allegation No. 1; as noted above; *see* III.F., *infra*); (2) being denied security measures, which Jumbo argues resulted in losses to his store that allegedly impacted his bonuses (*see* Ex. A, Allegation No. 6; III.K., *infra*); and (3) being terminated (*see* Ex. A, Allegation No. 10; III.O., *infra*).  All of Jumbo's other claims for discrimination and retaliation (Ex. A, Allegation Nos. 2, 3, 4, 5, 7, 8, 9, 11, and 12; *see* III. G-J, L-N, and P-Q, *infra*) automatically fail due to Jumbo's inability to establish any possible adverse employment action related to them.

As to *all* of Jumbo's complaints of discrimination, he cannot establish that any similarly situated non-Nigerian was treated more favorably than he was treated under similar circumstances.  Accordingly, Jumbo is unable to establish a prima facie case as to each and every one of Jumbo's discrimination claims, and as such, they further fail as a matter of law.  Additionally, as demonstrated herein, certain complained of actions are supported by legitimate non-discriminatory business reasons that have nothing to do with Jumbo's national origin, further demonstrating that these claims should be dismissed as a matter of law.

Lastly, related to Jumbo's claims of retaliation, he will not be able to demonstrate any

issue of fact that the complained of incidents would not have happened but-for any alleged protected activity.  As such, Defendant is entitled to summary judgment as to each of Jumbo's asserted retaliation claims (Allegations 7-12, *see* III. L-Q, *infra*).

**F.  Allegation No. 1 - No Prima Facie Case for Failure to Hire Directly Into a Store Manager Position; and Defendant's Legitimate, Non-discriminatory Reasons**[6]

Jumbo alleges discrimination because: he was not hired directly into a Store Manager position, but was instead, hired into a Store Manager Candidate position to be trained for a Store Manager position; and also because he was told that he would have to "prove himself" before being promoted from Store Manager Candidate to Store Manager.  (*See* Ex. B, Depo. 67:5-17).  Jumbo cannot establish a prima facie case for two reasons related to this Allegation No. 1.  First, Jumbo was not qualified to hold a Store Manager position until he was properly trained by way of initial employment in the Store Manager Candidate position. Jumbo admits that the Store Manager Candidate position is a temporary position, specifically used to train managers for direct promotion to a Store Manager position *after* they learn how to run a Dollar General store. (Ex. B, Depo. 86:2-87:15).  This was the proper position for Plaintiff who had no experience running a Dollar General store.  Because Jumbo had never worked in a Dollar General store, he did not, for example, understand Dollar General's seven-day workflow procedures, the time-keeping program for getting store employees paid, and how to receive and process merchandise from Dollar General's many vendors.  (Ex. B, Depo. 86:15-87:15).  Thus, in response to Plaintiff's claim that he was discriminatorily denied direct placement into a position that he was not yet qualified to hold, he cannot establish a prima facie case.

---

[6] As this claim related to his initial hire in October of 2012 precedes any alleged protected activity, it cannot form the basis of any retaliation claim.

Second, Plaintiff cannot establish that he was treated less favorably than similarly situated employees of differing national origins.  Plaintiff admits that he knows of no other external hire (someone with no prior Dollar General training or work experience, like himself) who was directly placed into a Store Manager position without first being trained as a Store Manager Candidate.  (Ex. B, Depo. 87:16-20).  In the year that Jumbo was hired, 2012, there were seven external hires related to Store Manager positions.  (Ex. C, Jones Decl. ¶6).  Each of these seven candidates was hired into the Store Manager Candidate positon, and none were hired directly into a Store Manager position.  (*Id.*, outlining district hires in Store Manager recruiting in 2012).

Lastly, Jumbo complains of discrimination for being told that he would have to "prove himself" before being promoted from Store Manager Candidate to Store Manager.  Jumbo admits that he did, in fact, prove himself, and was promoted.  (Ex. B, Depo. 88:21-89:10).  Thus, there was no adverse employment action related to this alleged statement.  Moreover, Jumbo admits that he does not know of any Store Manager Candidate that was hired and told he or she would *not* need to prove himself or herself in order to be promoted (Ex. B, Depo. 88:4-6), and admits that it is logical that *any* Store Manager Candidate should have to prove himself or herself capable of running a Dollar General store before being promoted.  (Ex. B, Depo. 88:7-11).  In fact, of the seven candidates hired in 2012, over half of them (four) were *not* promoted from their Store Manager Candidate positions into Store Manager positions, but were instead all transferred to hourly Assistant Store Manager positions.  (Ex. C, Jones Decl. ¶7).  As Jumbo was granted a promotion to a Store Manager position where other non-Nigerian Store Manager Candidates hired in 2012 were not, Jumbo was not treated less favorably than candidates of differing national origins, but instead was treated *more* favorably than the majority of them.

-16-

Because Jumbo cannot establish less favorable treatment based upon his national origin related to not being hired directly into a Store Manager position and being told he had to prove himself to be promoted, this claim fails as a matter of law, and must be dismissed.  Even if he could establish a prima facie case, which he cannot, there is a legitimate non-discriminatory reason that Jumbo (and all other external candidates for Store Manager positions) were placed in a training position before being placed as a Store Manger over an individual retail store.  That reason is that Dollar General wants to ensure that its Store Managers are properly trained on Dollar General's policies and procedures, and that they prove themselves to their District Managers as ready to manage a Dollar General store and a full staff of employees, before it puts them solely in charge of the daily operations of a Dollar General store.  (Ex. C, Jones Decl. ¶5).

### G.   Allegation No. 2 - No Prima Facie Case for Any Failure of District Manager to Train Jumbo on RMS System; and Defendant's Legitimate, Non-Discriminatory Reasons[7]

Jumbo suffered no adverse employment action by not being trained by his District Manager on the RMS system, nor can he show that he was treated less favorably than a similarly situated person not in his protected class.  Jumbo alleges his District Manager, Ejiogu, refused to train him on the RMS system, a system that allowed Store Managers to look at applications for employment to assist in the hiring process for their stores.  (Ex. B, Depo. 156:7-13; 173:3-7). First, Jumbo does not allege, and cannot, that it was his District Manger's job to train him on the RMS system.  In fact, Jumbo admits that he was, instead, trained for his position by a Store Manager Trainer, *not* his District Manager.  (Ex. B, Depo. 89:2-10; 151:16-152:14; 153:1-5; 153:17-25).  Importantly, Jumbo also knew from his Store Manager training that he could always

---

[7] As this allegation of failure to train Jumbo on RMS was part of Jumbo's May 20, 2013 complaint (and the first complaint that could be construed as protected activity (*see* II.B., *supra*), it cannot form the basis of any retaliation claim.

consult with other Store Managers as mentors once he was in his own store, and he in fact *did* consult with a mentor on this very issue when his District Manager allegedly declined to train him.  Jumbo admits that upon his inquiry to a mentor Store Manager, the mentor walked him through the RMS system, after which he understood how to use the system.  (Ex. B, Depo. 175:25-176:13; 163:17-164:16 ("Q: And when you decided that not knowing how to work RMS was a problem for you you solved that problem by calling a mentor, correct? A: Yes."); *Id.* 176:10-13).

Further, Dollar General provided Jumbo with access to a Computer Based Learning (CBL) module that taught him how to use the RMS system, which Jumbo could access at any time.  (Ex. C, Jones Decl. ¶18).  Jumbo completed the self-training CBL on the RMS system on May 22, 2012 (*Id.*), just two days after his complaint of no RMS training on May 20, 2013 (*see* II.B., *supra*), and he understood how to use the RMS system thereafter.  (Ex. B, Depo. 156:7-157:8).

Store Manager Candidates are also trained on using the RMS system as part of their training curriculum.  (Ex. C, Jones Decl. ¶16).  Jumbo attended in-person Store Manager training where he was trained by Store Manager trainers.  (Ex. B, Depo. 89:2-10; 151:16-152:14; 153:1-5; 153:17-25; Ex. C, Jones Decl. ¶17).  Jumbo admits that he accessed this RMS CBL, and after doing so, understood how to use the RMS system.  (Ex. B, Depo. 156:7-157:8).  Thus, as Jumbo had the ability to get the training from three other sources, and in fact admittedly got the training from these other sources, he experienced no adverse employment action by not being trained specifically by his District Manager on the RMS system.  Moreover, Jumbo readily admits that he is not aware of any other Store Manager that was trained on RMS by his District Manager, and thus, knows of no similarly situated person treated more favorably that himself.  (Ex. B,

Depo. 178:25-179:3).

Even if he could establish a prima facie case, which he cannot, there is a legitimate non-discriminatory reason that District Managers do not attempt to ensure the complete training of Store Managers on all aspects of their jobs, including the RMS system.  Namely, it is not their responsibility to do so.  Instead, Dollar General: has separate employees that are hired to provide training to employees who seek to become Store Managers (Ex. C, Jones Decl. ¶15); sends Store Manager Candidates to Store Manager training classes to learn Dollar General's processes, including how to use the RMS system (Ex. C, Jones Decl. ¶16), which Jumbo admittedly attended (Ex. B, Depo. 89:2-10; 151:16-152:14; 153:1-5; 153:17-25); made self-taught computer-based learning (CBLs) modules available to Jumbo, which he admittedly accessed and successfully used to train himself on the RMS system (Ex. B, Depo. 156:7-157:8; Ex. C, Jones Decl. ¶18 (Jumbo completed this CBL training on the RMS system on May 22, 2012)); and had mentoring resources for its newly trained managers, which Jumbo admittedly accessed and successfully used for additional RMS training.  (Ex. B, Depo. 163:17-164:16; 175:25-176:13).  As such, Dollar General does not require its District Managers to bear the responsibility for training or retraining their Store Managers on all aspects of their job performance on top of their many other duties and responsibilities.  (Ex. C, Jones Decl. ¶15).

### H.      Allegation No. 3 - No Prima Facie Case for the Claim that Jumbo Was Discriminated Against Because He Allegedly Was Not Provided an Assistant Store Manager

Jumbo next complains of discrimination because, for a few months in his store, he operated without an Assistant Store Manager because his District Manager allegedly refused to

hire an ASM for his store, and denied him the authority to hire an ASM on his own.[8]  Taking this allegation as true for the purposes of this Motion only, there is no adverse employment action as a result of having an open ASM position at his store for a couple of months.[9]

Notably, Jumbo had authority to hire for all other positions in his store (Ex. B, Depo. 127:15-25; 129:2-8), including the Lead Sales Associate ("LSA") position. LSAs were allowed to carry store keys and could open and close the store.  (Ex. B, Depo. 127:19-23).  Jumbo had two LSAs at the time that his store was without an ASM.  (Ex. B, Depo. 143:14-24).  Jumbo admits that he was able to operate his store on a daily basis without an ASM.  (Ex. B, Depo. 146:18-147:1).  Specifically, Jumbo outlined the tasks that he claims he would have relied upon an ASM to perform, had he had one during that time period when he did not.  Those tasks were: opening and closing the store, ordering, cash audits, bank deposits, plan-o-grams, and weekly sales promotions.  (Ex. B, Depo. 143:25-144:18).  Jumbo admits that there were three persons in his store (himself and his two LSAs) that could open and close the store – even when he had no ASM.  (Ex. B, Depo. 143:14-24; 146:9-11).  Jumbo further admits that he, as the Store Manager, almost always did the ordering for his store – even when he had an ASM – because he wanted to ensure the ordering was done correctly for his store (Ex. B, Depo. 145:16-146:1), and further that he was training another non-ASM employee to do ordering through on-hand-adjustments because he planned to promote her.  (Ex. B, Depo. 144:19-145:7).  Jumbo further admits that he

---

[8] He further alleges that it was his District Manager's responsibility and not his own, to hire an ASM for his store.  This is disputed and contrary to Jumbo's admission that he was, in fact, allowed to hire ASMs for his store when he requested permission from his District Manager to do so.  (Ex. B, Depo. 231:23-232:5).  Nonetheless, this is not relevant for the purposes of this motion as Jumbo cannot state a prima facie case related to this Allegation No. 3.

[9] There was no ASM in Store No. 12029, the store Jumbo managed, during week ending October 19, 2012 through week ending January 4, 2013 (12 weeks).  (Ex. C, Jones Decl. ¶9).  An ASM was placed in his store in week ending January 11, 2013.  (Ex. C, Jones Decl. ¶9).

could delegate plan-o-grams and weekly sales promotions (such as price changes) to his LSAs. (Ex. B, Depo. 146:2-8).  In fact, Jumbo admits that the only thing that he could not delegate to a LSA instead of an ASM would be taking the bank deposits, as only a Store Manager or ASM are allowed to take those to the bank.  (Ex. B, Depo. 146:12-17).  However, having to take the bank deposit to the bank, as the store's only exempt employee, is not an adverse employment action, but was instead, part of his Store Manager job duties, as specifically set forth in the Store Manager Training.  (Ex. C, Jones Decl. ¶19 and; Ex. C, Jones Decl. Ex. 3 (Excerpt from Store Manager Training materials related to the time period that Jumbo attended Store Manager training, indicating that it is the Store Manager's job to ensure deposits get to the bank)).  Jumbo admits to no adverse employment as a result of not having an ASM.  (Ex. B, Depo. 147:2-14 (Jumbo was allowed to earn his same salary, had the same bonus potential, and was not demoted or terminated because he did not, temporarily, have an ASM)).

During the time period that Jumbo's store had an ASM vacancy, Jumbo was not aware of any other store who had open ASM positions, and was also not aware of any store to which his District Manager provided an ASM during this same time period (Ex. B, Depo. 140:9-13; 142:13-19; 147:15-24), thus, Jumbo cannot establish any similarly situated employee, much less show that another employee was treated more favorably by Jumbo's District Manager than Jumbo was treated related to store staffing.  Moreover, although Jumbo alleges that Ejiogu provided Store Manager Aurora Mora with an ASM (Ex. B, Depo. 90:4-19; 93:6-10), she too had a period of time where she did not have an ASM during her tenure as a Store Manager and

while Ejiogu was her District Manager.[10]

### I.     Allegation No. 4 - No Prima Facie Case for Alleging that Jumbo's District Manager Threatened to (But Did Not) Transfer Him

Jumbo alleges that Ejiogu threatened to transfer Jumbo to another district because they were both Nigerian.  In response, Jumbo claims that he objected to being transferred, and as a result of his objection, Ejiogu did not transfer him.  (Ex. B, Depo. 195:10-23).  Jumbo remained as the Store Manager over Store No. 12029 for his entire tenure with Dollar General. (Ex. B, Depo. 121:25-122:3; 195:10-23; Ex. C, Jones Decl. ¶2).  Thus, even taking Jumbo's allegation as true, that his District Manager, on one occasion, threatened to transfer him because they were both Nigerian, he suffered no adverse employment action as a result as he was never transferred. Further, because no adverse employment action is associated with this alleged comment, it cannot be direct evidence of any national origin discrimination.  *See* III.B., *supra*.

### J.     Allegation No. 5 - No Prima Facie Case for Alleged "Abusive" Language Towards Plaintiff

Jumbo alleges three instances of "abusive" language, which he now characterizes as discriminatory.  First, Jumbo alleges Ejiogu used, on several occasions, the word "nonsense" related to certain of Jumbo's suggestions or ideas related to merchandise displays.  (Ex. B, Depo. 197:2-198:17).  As a result of Ejiogu being displeased with Jumbo's merchandising ideas, Jumbo was not demoted, his pay was not cut, he was not denied any bonus opportunities, nor did he experience any adverse employment action.  (Ex. B, Depo. 198:18-199:13).  Instead Jumbo admits that the sole consequence of Ejiogu finding his suggested displays to be "nonsense" was that Jumbo was required to take the displays down.  (Ex. B, Depo. 198:25-199:13).  As this

---

[10] There was no ASM in Store No. 12275, Aurora Mora's store, during the week ending January 20, 2012 through the week ending April 13, 2012 (13 weeks).  (Ex. C, Jones Decl. ¶10).  During this time period, Ejiogu was Mora's District Manager.  (Ex. C, Jones Decl. ¶10).

allegation of using "nonsense" was part of his May 20, 2013 complaint, it preceded any allegedly protected activity, and thus, cannot form the basis of any retaliation claim. *See* II. B., *supra*.

Second, Jumbo alleges that Ejiogu told Jumbo on one occasion that Ejiogu could do "whatever he wanted," though Jumbo cannot recall *any* context as to why or when such a comment was made.  (Ex. B, Depo. 200:9-14; 201:5-17; 203:3-207:2).  He can only recall that the comment came from Ejiogu after Jumbo had complained to the Regional Director that Ejiogu was "beginning to show some hostility and he's being disrespectful and I do not appreciate that." (Ex. B, Depo. 203:12-20).  Jumbo admits no other words were used in this initial complaint against Ejiogu.  (*Id*.).  Notably, these alleged complaints do not demonstrate any protected activity, and as this exchange happened before May 20, 2013 (Ex. B, Depo. 203:21-204:4), it occurred before any protected activity by Jumbo.  *See* II. B., *supra*.

Third, also before May 20, 2013 (and thus, before any protected activity (*see* II. B., *supra*)), Jumbo alleges that his District Manager told him on one occasion that he believed Jumbo was not the most honest person (Ex. B, Depo. 207:16-19), which Jumbo admits was not a statement having to do with his national origin.  (Ex. B, Depo. 209:4-25).  Believing Jumbo is a dishonest person is not discriminatory on the basis of his national origin.

In relation to each of these comments allegedly made in early 2013 by Ejiogu, Jumbo conceded that he was not fired, demoted, stripped of his job title, transferred, nor given a decrease in pay.  (Ex. B, Depo. 198:18-199:13; 247:16-249:2 (Jumbo admits no adverse employment actions in 2013 after these alleged comments were made before May 20, 2013)).[11]

---

[11] Although Jumbo speculates that he received a bonus in 2013 below what he would have received but-for an alleged discriminatory denial of security measures for his store (and a resulting loss from a tobacco burglary in 2013), this allegation is unrelated to the alleged

In summary, as to each of the three instances of complained of comments, Jumbo cannot establish an adverse employment action, nor can he demonstrate that others were treated more favorably than he was treated by his District Manager.  Moreover, as they occurred prior to any protected activity, they cannot form the basis of any retaliation claim. Lastly, in addition to being unrelated to any adverse employment action, none of these comments reference nor relate to his national origin.  As such, none amount to direct evidence of national origin discrimination, leaving each and every one of these alleged comments void of any legal significance.

### K. Allegation No. 6 - No Prima Facie Case For the Allegation that Jumbo Was Discriminatorily Denied Additional Security Measures to Deter Theft; and Defendant's Legitimate Non-Discriminatory Reasons

Jumbo alleges that he was discriminated against by Dollar General denying him additional security measures for his store.  In particular, he complains that he requested, but did not receive, security gates across the front of his store that *might have* prevented certain burglaries during non-business hours.  (Ex. B, Depo. 325:21-326:12).  Taking his allegation as true, that he requested security gates to deter burglaries in 2013, any decision by Dollar General not to provide security gates to Jumbo was not an adverse employment action as it did not result in any decrease in salary, demotion, transfer, or termination to Jumbo.  (Ex. B, Depo. 247:16-249:2).  Jumbo, however, speculates that the lack of gates *did* result in a decrease to his earnings because there was a burglary resulting in a theft of cigarettes in 2013,[12] which Jumbo seeks to

---

discriminatory comments, and is further disproven by the evidence presented herein.  *See* III.K., *infra*.

[12] Jumbo alleges that he was further impacted in his bonus because his District Manager required him to report to Dollar General an inflated amount of loss related to the cigarette burglary in 2013.  (Ex. B, Depo. 250:14-242:11).  However, the entire loss reported in Dollar General's records for the entire year for 2013 in Store No. 12029 was only $555.  (Exhibit G, Declaration of Ken Peschier "Peschier Decl." ¶2).  Removing all burglary losses from his store for the year,

attribute to having no security gates.   Jumbo further alleges that this burglary impacted his store's annual shrink numbers such that it diminished his annual shrink bonus potential. However, there is no truth to Jumbo's theory.   In 2013, Jumbo's shrink rate (including all burglaries during the year) was 6.87%.  (Ex. G, Peschier Decl. ¶3).  To be eligible for a shrink bonus in 2013, the shrink rate in Jumbo's store needed to be less than 5.35%.  (*Id*.).  If the loss resulted from all burglaries had not occurred in 2013, and thus, were not counted at all as losses in 2013 against his store, his shrink rate would have only improved from 6.87% to 6.82%.  (*Id*.). Thus, even without the complained of tobacco related burglaries counting against his store, Jumbo's bonus potential on shrink would have remained exactly the same.  (*Id*.).  Accordingly, there was no plausible adverse employment action resulting from Jumbo not receiving security gates as he requested.

Moreover, Jumbo cannot establish that others were similarly situated and treated more favorably.  Specifically, Jumbo will be unable to show that any other Store Manager requested a security gate to deter theft in his or her store in 2013.  Jumbo also cannot establish that any other Store Manager was granted a request to add security gates at their store for security measures during the same period of time that Jumbo alleges to have sought (and been denied) one.  Dollar General has no records to indicate that any security gates were added to any store in Plaintiff's district for security reasons in 2013.  (Ex. G, Peschier Decl. ¶6).

Lastly, there are legitimate, non-discriminatory reason for not adding security gates to Jumbo's store simply because he may have requested them.   Namely, security gates are expensive to install, and the loss suffered in Plaintiff's store from theft in 2013 was not so

---

whether they are accurate or inflated, would not have changed his bonus eligibility in 2013, as noted herein. *See* III.K. *infra*.

significant as to warrant such an expense.  (Ex. G, Peschier Decl. ¶5).  Even if requested, the marginal loss being suffered at Jumbo's store would not have been sufficient to gain approval by Dollar General to install security gates at this store.  (*Id*. at ¶4).  In fact, the large majority of Dollar General stores do not have security gates across their store fronts.  (*Id*. at ¶5).

     **L.**     **<u>Allegation No. 7 – Jumbo's Allegations that He Was Not Evaluated Nor Given a Raise Are False; No Prima Facie Case; and Defendant's Legitimate, Non-Discriminatory and Non-Retaliatory Reasons</u>**

Dollar General gives annual performance reviews to its Store Managers to evaluate them related to their performance during each fiscal operating year, which runs from February 1 of one year to the end of January the following year.  (Ex. C, Jones Decl. ¶11).  Thus, performance reviews take place after the close of a fiscal year, and in the first quarter of the following fiscal year.  (*Id*.).  Jumbo (along with other Store Managers) was evaluated in the first quarter of 2013 (namely March 2013) based upon his performance as a Store Manager in fiscal year 2012.  (*Id*. at ¶13).  Jumbo's District Manager, Ejiogu, evaluated Jumbo and signed Jumbo's performance review on March 3, 2013, ranking Jumbo as "Very Good" in ten categories, "Good" in four categories, and "Needs Improvement" in only two categories – with an overall "Good" rating, which is a favorable performance review.  (Ex. B, Depo. Exh. 13; Ex. C, Jones Decl. ¶14; *see also* Ex. D, Huffman Decl. ¶¶2-6; Ex. D, Huffman Decl. Exh. 2, 2012 Store Manager Performance Review).  Jumbo accessed his annual performance review on March 11, 2013, and acknowledged the same by adding his electronic signature.  (Ex. D, Huffman Decl. ¶¶2, 4).  Thereafter, and as a direct result of the favorable performance review given by his District Manager, Jumbo was given a merit-based pay raise.  (Ex. C, Jones Decl. ¶3).  Starting on April 6, 2013, Jumbo's annual salary was increased by 2.7% from $41,938.00 to $43,070.00, and remained at this higher salary through the end of his employment in January of 2014.  (*Id*.).

Jumbo admits that merit increases, like that he received in April 2013, are based upon favorable performance reviews.  (Ex. B, Depo. 104:23-105:10).

By way of this lawsuit, it appears that what Jumbo really complains of is he was not also evaluated on his one-year anniversary of being promoted to his Store Manager position, believing that it would be "industry standard" to give a performance review at an employee's one year anniversary.  (Ex. B, Depo. 112:5-21; 113:23-114:3; 117:6-21).  This was not (and is not) Dollar General's practice (Ex. C, Jones Decl. ¶12), nor did anyone at Dollar General make a representation to Jumbo that he would be evaluated on the time frame he imagined would be customary.  In fact, the only representation made to Jumbo related to annual evaluations was simply that he would be evaluated "annually."  (Ex. B, Depo. 117:6-21).

Related to the allegation of discrimination for not being evaluated on his one-year anniversary, Jumbo could not have suffered an adverse employment action when he was evaluated *earlier than* his one-year anniversary date.  Because he was evaluated less than five months into his position (and more than seven months prior to his one-year anniversary in his Store Manager position),[13] he was allowed to earn a *higher* salary more than seven months earlier than he would have earned it if he were not evaluated until October 13, 2013.  This resulted in a *favorable* employment action.

Finally, Dollar General focuses its annual performance reviews around its fiscal year end and not its Store Managers' dates of hire/promotion.  (Ex. C, Jones Decl. ¶12).  This is a legitimate, non-discriminatory reason for the timing of Jumbo's performance review.  Further, Jumbo cannot demonstrate any other Store Manager who was treated differently (much less more

---

[13] Jumbo was promoted on October 13, 2012 (Ex. C, Jones Decl. ¶2) and evaluated on March 3, 2013.  (*Id*. at ¶13 (less than five months later)).  This evaluation preceded his anniversary date (October 13, 2013) by more than seven months (from March 3, 2013 to October 13, 2013).

favorably) related to the timing of Store Manager performance reviews.  Additionally, Jumbo was treated more favorably than his comparators related to the size of his raise.  From the three Store Manager Candidates that were hired and promoted in his district in 2012 (namely, Jumbo, Sheila Doyle, and Gerald Johns (*see* Ex. C, Jones Decl. ¶7), Jumbo had the most favorable treatment related to raises.  (Ex. C, Jones Decl. ¶8).  And, when compared to the only Store Manager that Jumbo could identify by name as being treated more favorably than he was treated (Aurora Mora (*see* Ex. B, Depo. 90:4-19)), Jumbo's received precisely the same percentage raise.  (Ex. C, Jones Decl. ¶8).

**M.**    **Allegation No. 8 - Allegation that Jumbo Was Subject to Excessive Monitoring by His District Manager is False; No Prima Facie Case**

Although Jumbo asserts that his District Manager's level of monitoring increased after he complained of discrimination, Jumbo admits that he has no knowledge of the level of monitoring that his District Manager had done at his store *before* he complained of discrimination.  (Ex. B, Depo. 284:10-286:4).  Jumbo relies on only one incident to allege that he was subjected to "excessive" monitoring.  He complains that, on one day, his District Manager watched his store from across the street, and then questioned Jumbo as to whether a person who left with a large basket of merchandise had paid for it all.  (Ex. B, Depo. 264:13-265:19; 283:19-284:9).  Jumbo felt that this incident resulted in "excessive" (and discriminatory) monitoring.  (Ex. B, Depo. 230:18-231:2).  First, Jumbo fails to state a claim as this allegation, even if true, is of no legal significance related to either his discrimination or retaliation claims - there was no adverse employment action taken against him.  In response to the inquiry by his District Manager, Jumbo and his District Manager reviewed the sales transaction in question by checking the cameras and talking to the sales associate on duty, and confirmed that no theft had occurred.  (Ex. B, Depo.

265:13-18).  After doing so, in Jumbo's words, everything was then "okay."  (Ex. B, Depo. 265:14-19).  As such, Jumbo certainly does not attempt to link this alleged retaliatory action to any subsequent adverse employment action.

Further, Jumbo readily admits to having no personal knowledge of the level of monitoring that his District Manager did at *other* stores in the district.  (Ex. B, Depo. 230:18-231:5; 283:19-284:9; 285:10-17).  Thus, in addition to Jumbo being unable to offer any evidence as to the level of monitoring at his own store by his District Manager (other than one single incident), he also cannot offer any evidence that he was treated less favorably than other employees related to District Manager "monitoring."  Jumbo fails to state a prima facie case of discrimination or retaliation related to Allegation No. 8.

### N.   Allegation No. 9 – Allegation that Jumbo's Payroll Budget Was Cut is False; No Prima Facie Case

Jumbo alleges that after he complained of discrimination, his payroll budget was cut as a form of discrimination and Retaliation by his District Manager.  (Ex. B, Depo. 231:6-10; 341:12-18).  Jumbo characterizes this allegation as both discriminatory and retaliatory in response to his complaints of other alleged instances of discrimination.  However, his allegations of decreasing payroll budgets are not true. In comparing his average weekly allotted payroll budget for his Store Manager tenure *before* his May 20, 2013 complaints to the average weekly allotted payroll budget thereafter, he actually had a slightly higher average weekly payroll budgets *after* his complaint than he did before (although they are largely similar). (Ex. F, Declaration of Matt Bynum "Bynum Decl."  ¶¶3-4 (demonstrating that his average payroll budget for the weeks of October 13, 2012 to May 24, 2013 (32 weeks) was **$2,085** per week; while his average payroll budget for the weeks of May 25, 2013 to January 10, 2014 (33 weeks) was **$2,134** per week).

### O.    Allegation No. 10 – No Prima Facie Case for Allegation that Jumbo Was Terminated Because He Was Nigerian and/or in Retaliation for Prior Complaints of Discrimination; and Defendant's Legitimate, Non-Discriminatory and Non-Retaliatory Reasons

Plaintiff was promptly terminated on January 8, 2014 after falsifying company records on January 7, 2014 and lying to his District Manager about the progress of his assignments.  *See* II.C., *supra*.  On the early morning of January 7, 2014, Jumbo marked all of his START tasks (assigned job duties with a noon deadline) as "Completed" (Ex. B, Depo. 262:13-263:22; Ex. B, Depo. Exh. 25), when he, in fact, did not complete them.  (Ex. E, Ejiogu Decl. ¶2).  In addition, that same morning, he followed up with an e-mail to his District Manager, confirming that his assigned job duties were completed.  (*See* Ex. C, Jones Decl. ¶¶20-21; Ex C, Jones Decl. Exh. 4(a)-(d); Ex. E, Ejiogu Decl. ¶4; Ex. B, Depo. 262:13-263:22; Ex. B, Depo. Exh. 22).  At the time of making these misrepresentations, Jumbo had no knowledge that his District Manager would be visiting his store that morning.  (Ex. B, Depo. 263:2-264:4).  Upon discovery of his falsifications and misrepresentations, Jumbo was promptly terminated on January 8, 2014.  (Ex. E, Ejiogu Decl. ¶6; Ex. B, Depo. 313:7-24 (Jumbo was told he was being terminated for falsifying company records in marking tasks completed in the START system when they had not been completed); Ex. B, Depo. Exh. 31 (Personnel Action Form, noting reason for Jumbo's termination was falsification of company documents)).

In relation to Jumbo's claim that this termination was because of his national origin, he cannot demonstrate that others similarly situated were treated more favorably than he was treated.  Jumbo readily admits that he has no personal knowledge of any other Store Manager who, with the District Manager's knowledge, marked START tasks as "completed" before they were actually completed, and who was not terminated for such falsification of company records.

(Ex. B, Depo. 333:6-334:19; 335:3-336:21).

Moreover, in relation to Jumbo's claim that this termination was in retaliation for his prior complaints of national origin discrimination, he cannot demonstrate a causal link between any protected activity and his termination. Certainly, there is no proximity of time between any protected activity and his termination. His complaints of national origin discrimination were lodged in May and June of 2013, eight and seven months prior to his termination, respectively. *See* II.B., *supra*. In contrast, his termination occurred *one day* after his falsifications of company records and his misrepresentations to his District Manager. *See* II.C., *supra*. There is no basis to allege that his termination would not have occurred but-for his complaints of discrimination seven to eight months prior to his termination. Instead, he remained employed each and every day after his initial complaint for eight straight months. *See Esparza*, 2016 WL 5404795, at *7 (stating that temporal proximity can only support a retaliation claim when the events are "very close in time"). However, it *is* logical to conclude that Jumbo would not have been terminated but-for his dishonesty on January 7, 2014, as shown by the swift action to terminate him once discovered (on the following day, January 8, 2014). No reasonable fact-finder could find a but-for causal connection between Jumbo's January 8, 2014 termination and his May/June 2013 complaints of "discrimination." The temporal proximity between the protected activity and the adverse employment action may "raise an inference of retaliation, but the events must be very close in time." *Id*. Here, they simply are not at all close, thus, no inference can be drawn.

Moreover, related to both Jumbo's discrimination and retaliation claims regarding his termination, Dollar General had a legitimate, non-discriminatory, non-retaliatory reason for terminating Jumbo's employment – his direct and unequivocal dishonesty. *See* II.C., *supra*. And, Jumbo will be unable to offer any evidence of pretext related to this legitimate termination

-31-

reason. As such, Jumbo's discrimination and retaliation claims related to Allegation No. 10 fail as a matter of law.

P.   **Allegation No. 11 - Allegation that Jumbo's Store Visit Ratings "Tanked" in Retaliation for His Complaints of Discrimination are False; No Prima Facie Case**

Jumbo alleges his store visit audit scores related to periodic store visits "tanked" after he filed his complaints and that these scores were in retaliation for his complaints of discrimination. (Ex. B, Depo. 338:15-339:14).  District Managers have the ability, should they want to do so, to rate stores during periodic visits, and can give a store favorable scores (Model or Near Model) or unfavorable scores (Needs Improvement or Unacceptable).  (Ex. G, Peschier Decl. ¶7).  Jumbo alleges that prior to his complaints, his store was a "Model" store with "almost perfect scores." (Ex. B, Depo. 338:15-339:14).  For 2013 and through the end of Jumbo's employment in January of 2014, Dollar General's business records reflect, of all of the store visit scores recorded for Jumbo's store, his store was rated as "Model" only once.  This occurred on September 9, 2013, nearly four months *after* Jumbo's May 20, 2013 complaint. (Ex. G, Peschier Decl. ¶7 (No "Model" rating in Jumbo's store through May 2013 (the month he filed his first complaint of discrimination); Ex. F, Bynum Decl. ¶2 (one "Model" rating between June 2013 and January 2014, namely on September 9, 2013)).  Moreover, Jumbo's allegation that he was getting "almost perfect scores" on his store visits prior to the complaints (Ex. B, Depo. 339:10-14) is simply false.  Jumbo's rating in months January 2013 and March 2013 were both "Needs Improvement," unfavorable ratings.  (Ex. G. Peschier Decl. ¶7).

Moreover, Jumbo testified that his store was the store his District Manager almost always chose to show to visitors who came to the district, and that his District Manager would often give him additional payroll hours to help him keep his store in good shape.  (Ex. B, Depo.  323:24-

325:6).  Jumbo admits that other Store Managers in his district would have liked to receive the additional payroll hours that he received in order to keep his store in good shape (Ex. B, Depo. 324:15-325:6), demonstrating that he was treated more favorably that his peers in this respect. There are no other evaluations or write-ups in Dollar General's records related to Jumbo's performance as a Store Manager, other than his two favorable performance reviews – both submitted by his District Manager.  (See Ex. C, Jones Decl. ¶4; Ex. C, Jones Decl. Ex. 1 ("New Store Manager Evaluation," where Ejiogu rated Jumbo as satisfactory in all categories, and non-satisfactory in no categories); Ex. C, Jones Decl. Ex. 2 (2012 Performance Review, dated March 3, 2013, where Ejiogu ranked Jumbo "Good" overall, and "Very Good" in ten categories); see also Ex. B, Depo Exh. 16 and 13).  Jumbo's personnel records contain no negative write-ups whatsoever.  (Ex. C, Jones Decl. ¶4).  There is simply no evidence to support Jumbo's allegation that his evaluations "tanked," in any respect, after he voiced complaints of discrimination.

Even if Jumbo could established that his store visit scores had "tanked" after his complaints (which he cannot), the same could not have amounted to an adverse employment action.  Jumbo's store audits after May 20, 2013 (his first protected activity) were not used to set Jumbo's 2013 salary, which was set for the year before the dates of any alleged complaints of discrimination.   Jumbo's March 3, 2013 annual review and pay increase (see II.A., supra) predates his protected activity (see II.B., supra), and his salary remained at this higher rate through the end of 2013, and through the end of his employment on January 8, 2014.  (Ex. C, Jones Decl. ¶3).  Moreover, because Jumbo was not employed after fiscal year end in 2013 (which closed the end of January 2014) (see Ex. C, Jones Decl. ¶¶3,11), he was not evaluated for a 2014 salary increase.  Thus, there was no adverse employment action against Jumbo even if he could establish (which he cannot) that his late 2013 audit scores "tanked."

Lastly, as there was no related adverse employment action, Jumbo is (obviously) unable to show any causal connection between any protected activity and an adverse employment action.  Jumbo cannot establish a *prima facie* case of retaliation as to this Allegation No. 11.

**Q.    Allegation No. 12 – No Prima Facie Case for Alleged Write-Ups and Threats of Termination in Retaliation for His Complaints of National Origin Discrimination**

Jumbo alleges that, immediately after he complained on May 20, 2013 about alleged national origin discrimination by his District Manager,[14] he was "talked down to", threatened with termination, and written up in retaliation for his complaint.  (Ex. B, Depo. 213:18-24).  He describes, in particular, a meeting shortly after May 20, 2013 that was held at his store with his District Manager, a Human Resources Representative (Ty Jones), and a Loss Prevention Specialist (Gus Castano).  (Ex. B, Depo. 213:10-13; 214:15-19).  Although Jumbo alleges he was written up during this meeting for "plenty [of] company violations" and "voluminous violations" in retaliation for his May 20, 2013 complaint (Ex. B, Depo. 214:15-215:9; 338:21-339:2), there is no evidence of any such write-ups, Jumbo's personnel file contains no such write-ups (Ex. C, Jones Decl. ¶4),[15] and Jumbo cannot recall a single topic on which he was allegedly written up.  (Ex. B, Depo. 215:6-216:4).  Admittedly, any alleged write-up (if one ever existed) did not result in any adverse employment action as: Jumbo's salary did not decrease after May 20, 2013, and he was not demoted, transferred, stripped of his Store Manager title, nor terminated after his May 20, 2013 complaints.  (Ex. B, Depo. 221:17-223:10; 247:16-249:2).

Although Jumbo alleges his 2013 shrink bonus may have been less that it would have

---

[14] Again, the only reference to Jumbo's national origin in his first complaint against his District Manager was that his District Manager threatened to transfer him to another district since they were "both Nigerian."  *See* II.B., *supra*.

[15] There are no write-ups in Jumbo's personnel file, and Dollar General is aware of no such documents that Jumbo vaguely refers to by way of his deposition.  (Ex. C, Jones Decl. ¶4).

otherwise been (due to a burglary in 2013 (which Defendant has shown to be untrue – *see* III.K., *supra*)), he admits his ability to earn incentive bonuses in 2013 was not otherwise impacted. (Ex. B, Depo. 249:3-17; 260:20-261:11).  In fact, the fiscal quarter in which he made each of his complaints of discrimination/retaliation (the quarter of May – July, 2013) was the quarter in which he earned the *highest* quarterly incentive bonus of his entire tenure as a Store Manager. (Ex. B, Depo. 257:23-258:7; *see* also, Ex. B, Depo. Exh. 14, p. 17 (Jumbo's pay records, showing his largest incentive bonus of $950 paid following the close of the second fiscal quarter ending in July 2014).  Jumbo unequivocally admits that nothing adverse happened to him following the meeting in response to his May 20, 2013 complaint.  (Ex. B, Depo. 220:1-11 (when asked what happened after this meeting, Jumbo replied, "Nothing."); *see also* 221:17-223:10 (admits no adverse action following his May 20, 2013 complaints and before his June 2013 complaints); 247:16-249:2 (Jumbo admits no adverse employment actions in 2013 after his repeated complaints of national origin discrimination)).  Instead, Jumbo remained employed in his same Store Manager position, at the same store, at the same salary, and under the same terms and conditions for almost eight additional months thereafter until he was terminated for falsifying business records and his dishonesty related thereto, which are unquestionably legitimate non-discriminatory, non-retaliatory reasons.  *See* III.O., *supra.*

Lastly, as Jumbo simply cannot establish any but-for causal connection between any protected activity and any adverse employment action to support a *prima facie* case of retaliation, his claims in Allegation No. 12 must be dismissed as a matter of law.

## IV.    CONCLUSION

The undisputed facts and supporting legal authority lead to the conclusion that Dollar General did not discriminate against Jumbo based on his national origin and did not retaliate

against him for any alleged protected activity. Accordingly, summary judgment as to all claims against Dollar General should be granted as a matter of law, and the Court should award Dollar General, as the prevailing party, its costs in litigating this action.

Dated: January 13, 2017                                    Respectfully submitted,

                                                          */s/Melissa M. Hensley*
                                                          Joel S. Allen
                                                          Texas Bar No. 00795069
                                                          S.D.T.X. Bar No.18532
                                                          jallen@mcguirewoods.com
                                                          Melissa M. Hensley
                                                          Attorney-in-Charge
                                                          Texas Bar No. 00792578
                                                          S.D.T.X. Bar No. 24949
                                                          mhensley@mcguirewoods.com

                                                          McGuireWoods LLP
                                                          2000 McKinney Avenue, Suite 1400
                                                          Dallas, Texas 75201
                                                          Telephone: 214.932.6400
                                                          Facsimile: 214.932.6499

                                                          ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing has been served upon Plaintiff via email and regular mail, on this 13th day of January 2017, as follows:

Joshua Jumbo
3002 E. Crosstimbers
Houston, Texas 77093
joshuajumbo@ymail.com

                                                          */s/Melissa M. Hensley*
                                                          Melissa M. Hensley

-36-